Staples, J.
The principal question in this case for our determination is as to the validity of the settlement made John S. Burwell in favor of his wife under the deed of the 2d of October 1844. It is insisted that this set-ti-ement was excessive; that the property conveyed for Mrs. Burw ell’s benefit was far beyond the value of the dower interest relinquished by her; and to that extent at least is fraudulent and void. I do not understand it is seriously maintained that any actual fraud was perpetrated in the execution of the deed; but that Mrs. Burwell received largely more than an equivalent for her contingent. interest in her husband’s estate, and that to the extent of this excess she or her estate is liable to the creditors of her husband.
Before examining the evidence upon this point it may be proper to consider very briefly the principles of law applicable to settlements of this character.
It may be regarded as well settled in this State, that if a married woman relinquishes her claim for dower on' the faith of a settlement of other property made by her husband, or even if she make a relinquishment under a mere promise that other property shall be settled upon her as a compensation, in either case such settlement in her favor will be held good to the extent of a just compensation for the interest so relinquished. If the value of the property settled exceeds the value of the dower or other interest relinquished by the ypife, the deed will be vacated as to the excess and supported as to the residue. Taylor v. Moore, 2 Rand. 563; William, and Mary College v. Powell, 12 Gratt. 372-’85. In considering what is a proper provision for the wife in such cases, a court of equity will not enter into a strict calculation of the value of the settlement as compared with the property or interests relinquished. It is sufficient that the provision does not appear to be unreasonably excessive.
*447 In Ward v. Shallet, 2 Vesey sr. 16, Lord Hardwicke said, the settlement would be good against the husband s •creditors, unless proved vastly to exceed the consideration, , ’ , .. . . , . so that from the inadequacy a collusion or fraud was m-tended. In 1 Roper’s “ Husband and Wife,” 327, the rule is thus expressed: “ What is a reasonable proportion or value between the thing given or paid and that settled in consideration of it by the husband, is a calculation and result dependent upon each case in connection with collateral circumstances. The question is incapable of a general definite answer. * * * * This alone can be affirmed, that if the settlement be just in general, the •court does not weigh with exactness the particular advantage gained on the one side or the other; but that if the disproportion be so great as would strike any man of common sense with the inadequacy between the settlement and the price given for it, then such circumstance will raise a presumption of fraud so violent as to vitiate the transaction and let in the creditors.”
- In Taylor v. Moore Judge Green said, if there was no ground to impute fraud, the transaction might be favored so far as not to weigh uicely the respective values of the things given and received, unless the inequality was so great a3 in itself to amount to evidence of fraud. Judge Coalter expressed the opinion that, in view of the loss and sacrifice attending sales of real estate subject to the wife’s claim for dower, the husband can well afford to give a full price for the relinquishment, and a jury or a commissioner, as the case may be, ought to do the same.
What is the value of the wife’s contingent right of dower, the husband being still alive, is difficult to determine with anything like accuracy in any case. It must depend upon the condition aud qualities of the estate ; the ages of the husband and wife respectively — their health and expectancy of life. Ho fixed rule can belaid *448 down on the subject. The most that can be said is, that in the absence of fraud the settlement will not he dis-unless it manifestly appear to be grossly excessive.
Prese:nt case the question of actual fraud may be thrown out of view. There is. not the slightest ground for imputing it to either of the parties concerned in the transaction. ■ Let us see, then, whether there was any such gross inequality in the settlement as to call for the interference of a court of equity in behalf of the-creditors.
The settlement was made in October 1844. Mrs. Burwell was then fifty-four years old, and Mr. Burwell about sixty-eight. Ilis death occurred in 1854, hers in 1869 ; so that she survived him about fifteen years. Her-dower interest in the lands sold for the benefit of the creditors is estimated by the commissioner at a fraction less than two thousand dollars*. The property settled upon her by -way of compensation for this interest consisted of three slaves: one of them, an old man, with a_ fractured skull, proved to be an incumbrance; a small girl of very little value; and a woman not estimated by any one as worth more four or five hundred dollars. There was also a lot of farming implements and household furniture, very much used and obviously worth but little; a number of old and worthless horses, besides-sheep and cattle; and a small supply of farm products for the use of the family. If this property, instead of being conveyed to Mrs. Burwell, had been sold under execution for the benefit of the creditors, it is more than probable it would not have realized the estimate placed upon it by the commissioner. That officer, a very intelligent lawyer, and afterwards judge of the County court of Franklin, having all the witnesses before him, and perfectly competent to form a correct estimate of their' *449 capacity and intelligence, came to the conclusion that the settlement was not excessive.
There is another circumstance which strongly shows the value placed upon the property at the time by persons interested to know and competent to form a correct conclusion upon this subject. The entire arrangement was made with the knowledge and consent of Mr. Bur-well’s securities, bound for him to a large amount — much larger than his estate was ever expected to pay. They were present, with one exception, when the relinquishment by Mrs. Burwell took place and the settlement was made for her benefit. They were invited to attend on that occasion. The entire transaction was conceived and consummated in their interests and for their advantage; and it is very difficult to believe they would ever have assented to it if the settlement was so grossly excessive as is now represented.
The arrangement was not only sanctioned by the securities, but it seems that the creditors did not interpose any objection — at least none of them made any complaint until nearly ten years after, when these suits were instituted. The witnesses were examined in 1856 or 1857, more than twelve years after the date of the transaction. They were called on to testify as to matters about which they could not, in the nature of things, be very accurately iuformed — the value of property the greater portion of which had perished or had been long before consumed.
I think the commissioner was entirely correct in declaring that the witnesses for the plaintiff did not show such a knowledge of the property as entitled their testimony to much weight. In view of all the circumstances, without attempting to discuss in detail the testimony of the witnesses or to reconcile their conflicting views, I am satisfied the evidence is not sufficient to impeach the *450 settlement of 1844, either as fraudulent or as being grossly in excess of the interest surrendered by Mrs. Burwell.
In regard to the distributive interest of Mrs. Burwell in her father’s estate, also included in the deed of settlement, it consisted of two very infirm slaves, proved to be worth about five hundred dollars. If this interest could be regarded as a part of Mr. Burwell’s estate at the time the deed was made, it is very questionable, to say the least, whether, wdth the other property, it would render the settlement so excessive as to justify the interposition of the courts. But, throwing this out of view7, it is clear that at the time of the execution of the deed these slaves had not been reduced into the possession of Mr. Burwell, and it was very doubtful if they ever would be. They were then under the control of the administrator for the purpose of paying the debts of his intestate wdth their hires, and no distribution ever in fact took place until 1852; eight years after the settlement.
It is very obvious that these negroes could not, in any view, have constituted an adequate provision for Mrs. Burwell; and a court of equity would not only not have aided the creditors in getting possession of them, but, considering the old age of Mr. Burwell and his insolvent condition, it would have interfered in the wdfe’s behalf and required their settlement upon her and for her exclusive use and benefit.
Bor these reasons they are not to be treated as belonging to Mr. Burwell’s estate, and ought not to be taken into consideration in estimating the value of the property received by Mrs. Burwell under the deed of settlement.
It only remains to bestow a very brief consideration upon the cross bill of the appellee, Rives. A statement *451 of facts is, however, first necessary to a proper understanding of the matter. Mr. Burwell, in the deed executed by him for the benefit of his sureties, included slaves. These slaves were sold by the trustee in 1845, purchased by Wiley P. Woods, and left by him with the family of Mr. Burwell. In 1851 he (Woods) conveyed them to trustees for Mrs. Burwell’s benefit; and they remained in her possession until 1859, when the appellee, Rives, caused an execution to be levied upon one of them. Mrs. Burwell thereupon obtained an injunction to the sale. Rives filed an answer, and in October 1860 exhibited his cross bill impeaching Mrs. Burwell’s title, and claiming that while these slaves were nominally purchased by Wiley P. Woods, they were paid for with money furnished by Mr. John S. Burwell. Ro process was ever issued upon this bill, no answer was ever filed, and indeed nothing was ever done to mature it for a hearing; and yet the judge of the Circuit court, by his decree of October 1869, dissolves Mrs. Burwell’s injunction and dismisses her bill with costs, and also awards to Rives’s estate the costs of the cross bill. The decree is erroneous in both respects.
It must be remembered that Mrs. Burwell was in possession of these slaves from the year 1848 to the year 1859; and neither Rives nor Lumsden, so far as this record discloses, ever suggested fraud in the purchase under which he claimed. Ro reference is made to the matter in either of the bills filed by them in 1853, although they appear to have investigated and impeached every transaction relating to property or money with which Mrs. Burwell was in any manner even remotely connected. The excuse given by Rives for his delay is altogether insufficient. It is impossible he could have supposed the slaves were the property of Wiley Woods; because they were never in the possession of the latter; *452 and the deed on record for eight years previously, made it manifest they were claimed by Mrs. Burwell as her property exclusively. Strange to say, after Rives, according to his own showing, had obtained all necessary information upon the subject, he never moved to dissolve the injunction; nor did he ever take the first step in the prosecution of his cross suit.
Both of these cases seem to have been foi’gotten and-abandoned, as nothing was ever done in either of them until they were brought into the decree of 1869. The only solution of this conduct is, that Rives was probably satisfied he could not maintain his pretension, and that he could more safely attack the settlement.
I am satisfied that these slaves were not paid for by John S. Burwell. He was at that time utterly insolvent; he had fairly devoted all his propei’ty to his creditors, and it is difficult to see how he could have raised the necessary means to make the purchase. The explanation made by oue of the witnesses is probably the more correct account; and that is, that the money was furnished by Mi’s. Burwell’s relatives. Whether this be true or not, there is not a scintilla of opposing evidence ; and I do not see how we can impute fraud when there is nothing in the testimony or in the nature of the transaction to establish, it.
My opinion then is, without considering the question of the effect of the statute of limitations, that the Circuit court erred in decreeing against Mrs. Burwell’s representatives ou account of the propei’ty embraced in the deed of settlement; and erred in dissolving the injunction and in awarding costs upon the cross bill. That decree must, therefore, be reversed, and a decree entered dismissing the original bill of Lumsden and Rives respectively, with costs; dismissing the cross bill without costs; *453 no appearance having been entered thereto, and perpetoatmg the injunction of Mrs. Jourwell.
The other j'udges concurred in the opinion of Staples, J.
Decree reversed.